# Case No.: <u>23-40144</u>

# In the United States Court of Appeals for the Fifth Circuit

### UNITED STATES OF AMERICA,
### PLAINTIFF – APPELLEE

### V.

### CHAD MICHAEL RIDER
### DEFENDANT – APPELLANT

Direct Appeal from the United States District Court for the Eastern District of Texas, Sherman Division, No. 4:20-CR-232-2, the Honorable Amos L. Mazzant, presiding.

## Appellant's Opening Brief

**NILES S. ILLICH**
**SCOTT H. PALMER, P.C.**

15455 Dallas Parkway, Suite 540
Addison, Texas 75001
<u>Direct</u>: (972) 204-5452
<u>Fax</u>:    (214) 992-9900
<u>Email</u>: Niles@scottpalmerlaw.com

**HOWARD ALLEN SOHN**

1500 Gateway Blvd., Suite 220
Boynton Beach, Florida 33426

<u>**ATTORNEYS FOR APPELLANT**</u>

CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. **Chad Michael Rider**, (Plaintiff/Appellant);

2. **Niles Illich**, Scott H. Palmer, P.C. 15455 Dallas Parkway, Suite 540, Addison, Texas 75001 (Attorney for Appellant on appeal);

3. **Michael Phillip Levine**, Scott H. Palmer, P.C., 15455 Dallas Parkway, Suite 540, Addison, Texas 75001 (Attorney for Appellant at trial);

4. **Howard Allen Sohn**, 1500 Gateway Blvd, Suite 220, Boynton Beach, Florida 33426. (Attorney for Appellant at trial and on appeal);

5. **Daniel Karp**, Fee Smith Sharp & Vitullo, LLP, 13155 Noel Road, Suite 1000, Dallas, Texas 75240 (Attorney for Appellant at trial);

6. **Heather M. Fisher**, Law Offices of Heather M. Fisher, 1104 N. Locust Street, Denton, Texas 76201 (Attorney for Appellant at trial);

7. **Joel Keith Petrazio**, Petrazio Law Firm, 5465 Legacy Drive, Suite 650, Plano, Texas 75024 (Attorney for Appellant at trial);

8. **Michael Cleveland Wynne**, Nall Pelley & Wynne LLP, 707 W Washington, P.O. Box 2228, Sherman, Texas 75091-2228 (Attorney for Movant at trial);

9. **The United States Attorney's Office, Marisa J. Miller, Jay Robert Combs and Bradley Elliott Visosky**, 101 East Park Boulevard, Suite 500, Plano, Texas 75074 (Attorneys for Appellee at trial and on appeal);

10. **The Honorable Kimberly Priest Johnson** (United States Magistrate Judge); and,

11. **The Honorable Amos L. Mazzant, III** (United States District Court Judge for trial)

*/s/ Niles Illich*
Niles Illich

**Attorney of Record for Appellant Chad Michael Rider.**

STATEMENT REGARDING ORAL ARGUMENT

Counsel for Appellant requests oral argument. Appellant presents five issues including: a constructive amendment, error in refusing expert testimony, error in denying a motion to suppress, sufficiency of the evidence for two of three counts, and whether the sentence was substantively reasonable.

The challenge to the denial of the motion to suppress asks whether a police officer violates due process by implicating a shared faith with a suspect and then exploits that shared faith to encourage the suspect to confess to the police as opposed to God. In *Trammell*, the Supreme Court recognized "the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return." It is this "human need" that the detective weaponized in his interview; this is constitutionally impermissible.

Further, the jury was asked to decide whether the images in dispute were intended "to elicit a sexual response in the viewer." Part of Appellant's response to that question was to call a clinical psychologist to testify that the professional examinations that Appellant underwent demonstrate that Appellant had no sexual interest in children. Yet the district court refused to allow this expert to testify.

The issues presented are of varying complexity, but all are worthy of this Court's time for oral argument.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .......................................................... ii

STATEMENT REGARDING ORAL ARGUMENT ............................................. iv

TABLE OF AUTHORITIES ...................................................................... vii

STATEMENT OF JURISDICTION ...................................................................10

STATEMENT OF ISSUES PRESENTED FOR REVIEW .......................................11

STATEMENT OF THE CASE ...........................................................................14

SUMMARY OF THE ARGUMENT ...................................................................20

ARGUMENT ................................................................................................23

Appellant's First Issue:  In his first issue, Appellant contends the district court erred in denying his motion to suppress...............................................................23

I.      Standard of Review...........................................................................23

II.     Due Process and Voluntariness of a Statement .................................23

   A.  General law .....................................................................................23

   B.  United States v. Adair......................................................................24

III.    Facts .................................................................................................27

IV.     Application of Law to Fact ...............................................................35

V.      Conclusion .......................................................................................39

Appellant's Second Issue:  In his second issue, Appellant contends the district court erred when it granted the government's request to strike Appellant's expert witness under Rules 401, 403, and 702 of the Federal Rules of Evidence............................41

I.      Standard of Review...........................................................................41

II.     Evidentiary Rules: Rules 401, 403, and 702 of the rules of evidence...........41

   A.  Rule 401 ..........................................................................................41

   B.  Rule 403 ..........................................................................................41

   C.  Rule 702 ..........................................................................................42

III.    Facts .................................................................................................42

IV.    Application of Law to Fact .......................................................... 43

   A.  The trial court erred in finding the testimony irrelevant. ............................. 43

   B.  Rule 403 ............................................................................... 46

   C.  Rule 702 ............................................................................... 49

   D.  Conclusion on error .................................................................. 50

   E.  Harm .................................................................................. 51

V.     Conclusion ............................................................................ 52

Appellant's Third Issue:  In his third issue, Appellant contends the evidence was insufficient to support the verdict on counts two and three. Appellant does not challenge the sufficiency of the evidence for count one ......................................... 54

I.     Standard of Review ................................................................... 54

II.    Law .................................................................................. 54

III.   Facts ................................................................................ 58

IV.    Application of Law to the Facts ...................................................... 58

V.     Conclusion ........................................................................... 63

Appellant's Fourth Issue:  In his fourth issue, Appellant contends the trial court erroneously allowed a constructive amendment. .................................................... 64

Appellant's Fifth Issue:  In his fifth issue, Appellant contends the district court's sentence is substantively unreasonable. ................................................................ 68

CONCLUSION AND PRAYER ....................................................................... 72

CERTIFICATE OF SERVICE ....................................................................... 73

CERTIFICATE OF COMPLIANCE .................................................................... 74

TABLE OF AUTHORITIES

**CASES**

*Gall v. United States*,
  552 U.S. 38, 51, 128 S. Ct. 586, 169 L. Ed. 2d 445 (2007)..................................68

*Gibson v. Pollard*,
  No. 14-C-045, 2014 WL 11392978, at *1 (E.D. Wis. Apr. 29, 2014) ...............50

*Puckett v. United States*,
  556 U.S. 129, 135, 129 S. Ct. 1423, 1429, 173 L. Ed. 2d 266 (2009)................67

*Self v. Collins*,
  973 F.2d 1198, 1205 (5th Cir.1992) ............................................................ 23, 35

*Trammel v. United States*,
  445 U.S. 40, 51, 100 S. Ct. 906, 913, 63 L. Ed. 2d 186 (1980)................... 37, 38

*United States v. Adair*,
  No. 4:16-CR-527, 2018 WL 322228, at *1 (S.D. Tex. Jan. 8, 2018)24, 25, 26, 27

*United States v. Brown*,
  727 F.3d 329, 335 (5th Cir. 2013) ........................................................................54

*United States v. Buck*,
  324 F.3d 786, 790 (5th Cir. 2003) ........................................................................51

*United States v. Cantu*,
  167 F.3d 198, 203 (5th Cir. 1999) ........................................................................41

*United States v. Chambers*,
  408 F.3d 237, 238-239 (5th Cir. 2014) ......................................................... 64, 65

*United States v. Copeland*,
  820 F.3d 809, 814 (5th Cir. 2016) ........................................................................45

*United States v. Girod,*
  646 F.3d 304, 318 (5th Cir. 2011) ......................................41

*United States v. Harris,*
  702 F.3d 226, 230 (5th Cir. 2012) ......................................68

*United States v. Hoover,*
  467 F.3d 496, 502 (5th Cir. 2006) ......................................65

*United States v. Lim,*
  897 F.3d 673, 692 (5th Cir. 2018) .................................. 24, 35

*United States v. Lockhart,*
  844 F.3d 501, 514 (5th Cir. 2016) ................................. 64, 66

*United States v. Lopez-Velasquez,*
  526 F.3d 804, 807 (5th Cir. 2008) ......................................68

*United States v. McGee,*
  821 F.3d 644, 648 (5th Cir. 2016) ................................. 61, 62

*United States v. Muhammad,*
  14 F.4th 352, 357 (5th Cir. 2021) ......................................39

*United States v. Nolasco-Rosas,*
  286 F.3d 762, 765 (5th Cir. 2002) ......................................54

*United States v. Olvera,*
  687 F.3d 645, 647 (5th Cir.2012) ................................. 56, 61

*United States v. Perry,*
  35 F.4th 293, 325 (5th Cir. 2022) ......................................41

*United States v. Raymer,*
  876 F.2d 383, 386 (5th Cir.1989) .......................... 23, 35, 39

*United States v. Reed*,

    908 F.3d 102, 123 (5th Cir. 2018) ........................................................54

*United States v. Rojas-Martinez*,

    968 F.2d 415, 418 (5th Cir.1992) ................................................ 23, 35

*United States v. Roper*,

    63 F.4th 473, 475–76 (5th Cir. 2023) ...............................................23

*United States v. Scher*,

    601 F.3d 408, 411 (5th Cir. 2010) ....................................................66

*United States v. Smith*,

    440 F.3d 704, 708 (5th Cir. 2006) ....................................................68

*United States v. Steen*,

    634 F.3d 822, 827-828 (5th Cir. 2011) ................................ 45, 56, 58

**STATUTES**

18 U.S.C. § 2251(a) ....................................................... 45, 47, 55

18 U.S.C. § 2256(2)(A) ................................................. 45, 56, 61, 62

U.S.S.G. § 5G1.2 ................................................................69

**OTHER AUTHORITIES**

*The Book of Common Prayer* 320 (2007) ..............................................37

**RULES**

Fᴇᴅ. R. Eᴠɪᴅ. 401 ......................................................... 41, 43, 45, 47

Fᴇᴅ. R. Eᴠɪᴅ. 403 ............................................................... 41, 46

Fᴇᴅ. R. Eᴠɪᴅ. 702 ............................................................... 42, 49

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

UNITED STATES OF AMERICA,
Plaintiff - Appellee

v.

CHAD MICHAEL RIDER,
Defendant - Appellant

_____

### STATEMENT OF JURISDICTION

1. The jurisdiction of the United States District Court for the Northern District of Texas was founded upon 18 U.S.C. § 3231.

2. The jurisdiction of the United States Court of Appeals for the Fifth Circuit is founded upon 28 U.S.C. § 1291 and 18 U.S.C. § 3742, and is based upon the following particulars:

    I.      Date of Judgment: **February 21, 2023**; ROA.642-649.

    II.    Filing of notice of appeal: **March 02, 2023**. This notice of appeal was timely. FED. R. APP. P. 4(b)(2). ROA.658-659.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

FIRST ISSUE: A confession must be voluntary. Here the Interviewers manipulated Appellant's faith to suggest a confession to the police would satisfy Appellant's religious duty to confess sin. The Interviewers also emphasized that Appellant's best chance to be reunited with his family involved confessing to them. Was Appellant's statement voluntary?

SECOND ISSUE: The jury was asked to consider whether the disputed images "were designed to elicit a sexual response in the viewer." To answer this question, Appellant's expert intended to testify that Appellant had no sexual interest in children. The trial court prohibited this testimony on the ground that it was irrelevant, its prejudicial value significantly outweighed its probative value, and that it was not a matter for expert testimony. This issue, however, went directly to Appellant's defense. Did the district court err?

THIRD ISSUE: To secure a conviction the government must prove every element. Here that included a demonstration that the video included a "lascivious exhibition" of the minor's "genitals or

pubic area." Here, however, the images were of the victims as they undressed, showered, got out, and toweled off or as they used a commode behind a half wall. The videos did not focus on the "genitals or pubic area." As in this Court's opinion from *Steen*, the *Dost* factors demonstrate the evidence was insufficient to support the verdicts in counts two and three.[1]

FOURTH ISSUE: A constructive amendment occurs when a jury is permitted to convict the defendant upon a factual basis that effectively modifies an essential element of the offense charged in the indictment occurs. Here Appellant's indictment alleged he committed the offense with "a concealed recording device and the internet." The jury charge, however, for counts two and three allowed for a conviction if Appellant used any "materials that had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer."[2] Did the charge include a constructive amendment?

---

[1] Appellant does not challenge the sufficiency of the evidence for count one.
[2] ROA.497.

FIFTH ISSUE: Appellant's co-defendant had a long history of sexual interest in children. Appellant had none. Appellant went to trial and his co-defendant did not. Appellant received a sentence of 720 months and his co-defendant received a sentence of 360 months. Was Appellant's sentence substantively reasonable?

STATEMENT OF THE CASE

Like many cases, this one began with a tip from NCMEC.[3] The lead pointed to co-Defendant David Pettigrew.[4] Pettigrew was the minister at the Denison Church of the Nazarene.[5] In August 2020, federal agents searched the church.[6] The search yielded "[s]everal videos that captured children, in various stages of undress, taking baths in the church offices."[7] These videos included images of Appellant setting up cameras.[8]

Federal agents applied for and obtained both a search warrant and an arrest warrant for Appellant.[9] On the morning of the search approximately twenty law-enforcement officials (some in tactical gear) from various local, state, and federal agencies converged to serve the warrant.[10] As the various agencies converged, Appellant's family innocently walked out of the door to go to school.[11] Law-enforcement officials located Appellant on the interior stairs and promptly took him to an agent's car where officers or agents "patted" Appellant down to search for

---

[3] ROA.1092. As the Court is aware, NCMEC is the National Center for Missing and Exploited Children. ROA.1091.
[4] ROA.1092.
[5] ROA.1095.
[6] ROA.1094.
[7] ROA.1099.
[8] ROA.1099.
[9] ROA.721-722.
[10] ROA.715-716, 788.
[11] ROA.728-729.

weapons.[12]At this point, Appellant probably would not have been allowed to leave the area but could have left the car.[13] The interrogation in the car would last for one hour and forty-one minutes.[14] During the interview, the Interviewers:[15]

- explained that *Miranda* warnings were merely technical;[16]

- argued that co-defendant Pettigrew confessed and placed the blame on Appellant and that this was Appellant's opportunity to blame Pettigrew;[17]

- emphasized the shared faith between Appellant and the Detective and the duty to confess;[18] and,

- explained that the best way for Appellant to reunite with his family was to confess.[19]

Ultimately, the government obtained an indictment against Appellant.[20] The first superseding indictment alleged three counts all claiming Appellant produced child pornography (one count for conspiracy, one for attempt, and one stand-alone count); Appellant went to trial on this indictment.[21] On counts two and three, the

---

[12] ROA.735-736, 748.
[13] ROA.752.
[14] ROA.783.
[15] ROA.147-258.
[16] ROA.147-148.
[17] ROA.149, 150, 151, 170-171, 171-173, 175.
[18] ROA.176, 215-216.
[19] ROA.205-206.
[20] ROA.23-26.
[21] ROA.98-101, 630-637.

indictment alleged Appellant committed the acts with "a concealed recording device and the internet."[22]

Prior to trial, Appellant moved to suppress his statements in the hour and forty-one-minute interrogation in the police car. The trial court held an evidentiary hearing.[23] During this hearing, the detective testified that he used/manipulated Appellant's faith, in part, "to pull the statement out of him."[24]

The magistrate issued an opinion and denied Appellant's motion in full.[25] In rejecting Appellant's due-process argument, the magistrate wrote:

- ". . .the Court finds the circumstances of Defendant's interview with Agent Donnet and Detective Adcock are not similar to the circumstance of the police interview in Adair. In this case, in contrast to Adair, the Interviewers did not make representations that would deprive Defendant of the ability to understand the nature of his constitutional rights and the consequences of continuing to speak with the Interviewers."[26] And,

- "Here—unlike *Adair*—the Interviewers did not represent to Defendant that he would be better served if he spoke with Interviewers than if he did not."[27]

---

[22] ROA.100-101.
[23] ROA.675-830.
[24] ROA.762.
[25] ROA.319-348.
[26] ROA.346.
[27] ROA.347.

The district court overruled Appellant's objections to the magistrate's recommendation and adopted the magistrate's ruling as the order of the court.[28]

On June 30, 2022, Appellant gave notice of his intent to use Dr. Kristi Compton, Ph.D. as an expert.[29] This designation explained that Dr. Compton is a clinical psychologist.[30] Appellant's designation explained that Dr. Compton would testify:

- "that the Defendant's personality leads him to be compliant and avoidant of conflict, possibly to the point of being in denial about other's intentions."[31] And,

- "that based on the results of her examination, evaluation, testing, and assessment of the Defendant, it is her expert opinion that the Defendant….shows no signs of pedophilia."[32]

On July 11, 2022, before a trial began on July 18, 2022, the government moved to "exclude proposed opinion testimony of Kristi Compton."[33] The government sought to exclude this evidence under Rules 403 and 702.[34] On the

---

[28] ROA.464.
[29] ROA.315-317.
[30] ROA.316.
[31] ROA.316.
[32] ROA.316.
[33] ROA.351, 874.
[34] ROA.351-361. The government's motion also mentions Rule 401.

morning of trial, the district court excluded the testimony under Rules 401, 403, and 702.[35]

While the indictment alleged Appellant committed the acts with "a concealed recording device and the internet,"[36] the jury charge, for counts two and three, allowed for a conviction if Appellant used any "materials that had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer."[37]

Ultimately, the jury convicted Appellant. Appellant's PSR established that Pettigrew received a sentence of 360 months and supervised release of fifteen years.[38] The PSR also established a Guidelines range of 324 months to 360 months for each of the three counts in Appellant's indictment and that the counts should run concurrently.[39]

Counsel for Appellant argued that an upward variance was inappropriate, Counsel laid out at least six reasons the variance was not appropriate.[40]

The district court decided Appellant's case was "uniquely disturbing."[41] The district court also explained that had he had the opportunity to sentence Pettigrew to

---

[35] ROA.465-468, 874.
[36] ROA.100-101.
[37] ROA.497.
[38] ROA.4850.
[39] ROA.4864, 4867, 4916.
[40] ROA.2269, 2270, 2271, 2273, 2280-2283, 2284.
[41] ROA.2304.

a longer sentence that he would have done so.[42] Then the district court imposed the

sentence of 720 months on Appellant.[43] This appeal follows.

---

[42] <u>ROA.2309</u>.
[43] <u>ROA.2309</u>.

SUMMARY OF THE ARGUMENT

When the police interviewed Appellant, the interview lasted an hour and forty-one minutes. The interview occurred in a police car in front of Appellant's home as Appellant's family stood on the lawn and the police searched Appellant's home. The detective emphasized that he shared a common religious faith with Appellant and that as "believers" their duty was to confess. Appellant confessed and implicated himself. Appellant moved to suppress this on the grounds that the confession was not voluntary, but the district court—through the magistrate—denied relief.

To secure a conviction, the government had to convince the jury that Appellant took the disputed images "to elicit a sexual response in the viewer."[44] To counter this argument, Appellant proposed to have a clinical psychologist testify that Appellant had no sexual interest in children. The district court refused to allow this evidence. The district court explained the evidence was: irrelevant, the prejudicial value substantially outweighed the probative value, and it was not proper expert testimony. Yet the opposite was true. Accordingly, the district court erred.

The charge asked the jury, in counts two and three, whether there was a "lascivious exhibition of the genitals or pubic area of any person." The video in count two was of the subject using a toilet behind a short or half wall. There is no

---

[44] ROA.504.

display of genitals or of her pubic area. The placement of the camera, especially compared with the placement of the cameras in count one, prevents even the conclusion that this was an attempt to secure images of the subject's genitals or her pubic area. The analysis for count two is the same. The video in count two did not include a "lascivious exhibition of [the subject's] genitals or pubic area." Instead the video showed the subject undressing, getting into the shower, getting out of the shower, and toweling off. The static video in both counts did not focus on the subject's genitals or pubic area any more than it did the subject's hand. Was the evidence sufficient to support the verdict on counts two and three?

A constructive amendment occurs when the jury is permitted to convict the defendant upon a factual basis that effectively modifies an essential element of the offense charged in the indictment. Here the indictment alleged Appellant committed the offense with "a concealed recording device and the internet."[45] The jury charge, however, for counts two and three allowed for a conviction if Appellant used any "materials that had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer."[46] Counsel for Appellant did not object to this issue and thus the argument is presented on plain error. Appellant, however, can meet that exacting standard and reversal is required.

---

[45] ROA.100-101.
[46] ROA.497.

Finally, Appellant contends the sentence is substantively unreasonable. The NCMEC tip that started this investigation focused on Appellant's co-defendant Pettigrew. The Pettigrew gave a recorded statement in which Pettigrew:

- admitted to surreptitiously photographing children in public;

- misrepresenting his age to engage in sexual conversations;

- utilizing the dark web;

- admitted to getting an erection while changing the diaper of a friend's 1-year-old baby and admitted that his penis was out while changing the diaper;

- recorded his daughter's friend who was eleven years old;

- while a substitute teacher in a special education class in elementary school, he sexually assaulted a seven-year-old nonverbal autistic student while changing the child's diaper; and,

- also had more than 70,000 images of child pornography and other exploitive materials at the time of his arrest.[47]

Pettigrew did not go to trial and the district court imposed a sentence of 360 months. Appellant had none of the aggravating factors that Pettigrew had, went to trial, and received a sentence of 720 months.

---

[47] ROA.2284.

<u>ARGUMENT</u>

**Appellant's First Issue**

In his first issue, Appellant contends the district court erred in denying his motion to suppress.

## I.    Standard of Review

When reviewing the denial of a motion to suppress, this Court reviews questions of law de novo and findings of fact for clear error.[48] Factual findings are clearly erroneous only if a review of the record leaves this Court with a definite and firm conviction that a mistake has been committed.[49]

## II.    Due Process and Voluntariness of a Statement

### A. General law

Due-process guarantees prohibit the use at trial of involuntary statements given to the police.[50] The government must prove voluntariness by a preponderance of the evidence.[51] This Court evaluates voluntariness on a case-by-case basis, considering the totality of the circumstances.[52] Only statements produced by free and unconstrained choice will be deemed voluntary.[53] As this Court has explained, "[a] statement is involuntary ... if the tactics employed by law-enforcement officials

---

[48] *United States v. Roper*, <u>63 F.4th 473, 475</u>–76 (5th Cir. 2023).
[49] *Id.*
[50] *Self v. Collins*, <u>973 F.2d 1198, 1205</u> (5th Cir.1992).
[51] *United States v. Raymer*, <u>876 F.2d 383, 386</u> (5th Cir.1989).
[52] *United States v. Rojas-Martinez*, <u>968 F.2d 415, 418</u> (5th Cir.1992).
[53] *Collins*, <u>973 F.2d at 1205</u>.

constitute a Fifth Amendment due process violation and are 'so offensive to a civilized system of justice that they must be condemned.'"[54]

B. *United States v. Adair*

In *Adair*, a district court in the Southern District of Texas considered a claim that the police interrogation techniques violated due process.[55] Judge Ellison explained:

- The case began when the FBI identified suspicious files on Adair's computer, which was operating a peer-to-peer network from his home.[56]

- At 6:15 a.m., agents executed a federal search warrant on Adair's home, where Adair was the sole resident.[57]

- Agents told Adair to leave the home, they turned Adair over to state police who handcuffed Adair but told him he was not under arrest.[58]

- As the search continued, Adair expressed his need to use the restroom, the police assented, but an officer went with Adair.[59]

- The agent took Adair to his unmarked car. The agent and Adair sat in the front and another law-enforcement official sat in the back.[60]

---

[54] *United States v. Lim*, 897 F.3d 673, 692 (5th Cir. 2018) (analyzing statement in context of two-step strategy for interrogation to circumvent *Miranda*).
[55] *United States v. Adair*, No. 4:16-CR-527, 2018 WL 322228, at *1 (S.D. Tex. Jan. 8, 2018).
[56] *Id*.
[57] *Id*.
[58] *Id*.
[59] *Id*.
[60] *Id*.

- The officials told Adair they "did not plan to take him anywhere."[61]

- Adair began to talk but the agent interrupted and read Adair *Miranda* warnings "out of an abundance of caution."[62]

- The conversation was recorded but Adair was not aware of the recording.[63]

- "At one point, Defendant said 'I mean, am I screwing myself by not getting a lawyer? Be honest.'"[64]

- The agent explained to Adair that he was to determine whether Adair just had an interest in seeing images, or might actually harm a child.[65]

- At some point, Adair said he was "being straight" with the agent because the agent "was being straight with him."[66]

-  While in the car, Adair admitted to the elements of the pornography charges that were ultimately brought.[67]

- The agent told Adair that talking to the law-enforcement officers at this point in the investigation "really helps you."[68]

---

[61] *Id.*
[62] *Id.*
[63] *Id.*
[64] *Id.* at *2.
[65] *Id.*
[66] *Id.*
[67] *Id.*
[68] *Id.*

- Indeed, the agent told Adair the interrogation in the car was "your one-time chance to tell us your side of the story and what exactly is going on."[69]

Adair brought a motion to suppress and argued "that he never intentionally and voluntarily waived his rights to obtain counsel under *Miranda v. U.S.*, 384 U.S. 436 (1966). Alternatively, Defendant claims that the interrogation carried out by law-enforcement officers violated his due process rights."[70] Judge Ellison had questions about the application of *Miranda*, but wrote: "[a] lengthy analysis of precedents on custodial interrogation is, however, not necessary. Rather, the more pertinent analysis is under the due process clause."[71] The district court set out the law and then wrote:

> The government's conduct in this case is impossible to square with even minimum constitutional protections:
>
> 1. Agent Guerra offered Miranda warnings as simply "a formality."
>
> 2. No waiver of the right against self-incrimination was requested or obtained.
>
> 3. When asked by Defendant whether he was "screwing" himself by talking without the presence of a lawyer, Guerra told Defendant that, if he did not talk, Guerra would assume the worst, i.e., that he might cause physical harm to a child.
>
> 4. In other words, Guerra said that talking to him was the only way that Defendant could help himself.

---

[69] *Id.*
[70] *Id.* at *1.
[71] *Id.* at *2.

5. The officers also signaled that this was Defendant's one chance to help himself.

6. Guerra's interrogation caused Defendant to incriminate himself as to the elements of the felony charge, but also as to several enhancements under the sentencing guidelines.

7. Guerra offered that, at the end of the day, Defendant would go one way and law-enforcement officers another, when he knew that serious punishment was the all-but-certain result.

Stated simply, no one acting in the name of the United States should ever engage in such conduct–deceptive at best, and also seriously coercive. Defendant's Motion to Suppress as to his statements to law-enforcement officers on February 26, 2016, is GRANTED.[72]

## III.  Facts

Federal agents applied for and obtained both a search warrant and an arrest warrant for Appellant.[73] On the morning of the search approximately twenty law-enforcement officials converged to serve the warrant.[74] As the various agencies converged, Appellant's family innocently walked out of the door to go to school.[75] Law-enforcement officials located Appellant on the interior stairs and took him promptly to an agent's car where officers or agents "patted" Appellant down to search for weapons.[76]At this point, the agent testified that Appellant probably would

---

[72] *Id*. at *2-*3.
[73] ROA.721-722.
[74] ROA.715-716, 788.
[75] ROA.728-729.
[76] ROA.735-736, 748.

not have been allowed to leave the area but could have left the car.[77] The interrogation in the car would last for one hour and forty-one minutes.[78]

The government's response to Appellant's motion includes a transcript of the conversation between Appellant and the officers.[79] This transcript provides the following information:

- The law-enforcement agents identified themselves as such and read Appellant *Miranda* rights.[80]

- Before reading Appellant the standard *Miranda* warning, the agent said "[b]ut, um, we as the Fed, when we talk to someone, we always read them their rights. So, it's a matter of course, I'm gonna do that for you as well. Just to make sure we all understand, we're on the same page…it's my duty to advise you of your rights."[81]

- The agent ask Appellant to sign an acknowledgment, but Appellant said, "I'm not gonna sign anything, I don't know what's going on."[82] And the agent responded "that's perfectly fine. That's why I said you can sign it if you're comfortable. Uh, I don't necessarily need you to."[83]

---

[77] ROA.752.
[78] ROA.783.
[79] ROA.147-258.
[80] ROA.147-148.
[81] ROA.147-148.
[82] ROA.148.
[83] ROA.149.

- The agent then explained that co-defendant Pettigrew "basically, uh, unburden[ed] himself…I guess probably the guilt and—it's like a monkey off his back with, uh, with child pornography related issues. Um, and he did tell us about your involvement too."[84]

- Then the agent explained this interview was an opportunity to "just throw it all at [Pettigrew]."[85]

- The agent also explained, "[s]o, you know, um, what oftentimes happen is, you know, people have time they either take responsibility for what happened, the mistakes they made, that they need help to get them out of this hole they're in, or they try to find some way to blame other people, to have them shoulder the blame, you know, be the mastermind or the manipulator in this. So, regarding David, which now he's had some time to reflect, um, and then you know, having interviewed him for a while, I don't know if his strategy in this is going to put all the blame on what occurred in the church on you, because like we told you at the beginning, you're on those videos at the church helping to set up the hidden cameras. There's no doubt about it, it's you."[86]

- Then the agent told Appellant, "[s]o, we're not here to decide what your involvement is, or if you were involved. We know you were involved, that's

---

[84] ROA.149, 151.
[85] ROA.150.
[86] ROA.170-171.

why we're here. What we're here for is to get your side of the story to try to figure out whose idea it was, who the mastermind is, 'cause I can guarantee you that David is going to probably put all of this on you— your shoulders, okay? And I don't think being him being the pastor, you know, a paid member of the congregation and that part being part of his livelihood, and then you being just now a volunteer trying to help out, growin' up in that church. I think the person that would have the most influence, uh, over anyone in that church in being able to mastermind something and manipulate something would be the pastor of the church, using his authority as a spiritual leader and, you know, guide for that church to get people to do things, and to get people to get involved in things that they normally wouldn't do. That seems more plausible to me, but I— I'm gonna assume that once he, you know, he's sittin' there thinkin' about this and what he's gonna tell his family members and friends or board members, whoever goes and ends up visiting him, is that all of this is gonna be your doing. So— So, there— there's no doubt of your involvement. We're not— we're not here to— we want to know how you got involved in this, if he manipulated you into this, if he threatened you to get into this."[87]

---

[87] ROA.171-173.

- This exchange occurred during the interrogation: AGENT "I sat and watched probably ballpark, 100 videos. Now, they're from numerous camera angles of ten, plus or minus, kids. So— RIDER: Were my kids on this stuff? AGENT: Hold on. Numerous camera angles where David sets up cameras, so, turns on a camera, we can see him. And then there's you, you look into a camera, you've got a remote control, you turn it on, at one point you say, 'That one's recording.' You're talking to David. I watched you with a black laptop bag. Look at me, look over here."[88]

- The agent then explained what he understood to be Appellant's action and said "[s]o, it comes back to what Joe was talkin' about. What level of involvement, who got who? The pastor's already in custody, so he's— he's got a jump on you, blaming you."[89]

- Then this exchange occurred: DETECTIVE: "But there's a human side to everything that we do, and me being a believer myself, and me having that conversation with David, I mean, we understand the importance of—of repentance and— and getting forgiveness, and we understand that people make mistakes. But if you just— if you just show the public and the church the videos without a— the human component of it, the explanation on how

---

[88] ROA.173.
[89] ROA.175.

someone can get into that position, whether they're being manipulated or they have some sort of addiction— I mean, it just— it looks awful, but it— RIDER: I remember when we did that."[90]

- Appellant then explained Pettigrew's pernicious influence and the fact Pettigrew had nude images of Appellant's wife.[91]

- The agent and detective then asked for Appellant's phone, which Appellant surrendered to them with the passcode.[92]

- Appellant recognized the situation and stated, "I've been— we— we were looking at— we were trying to help the church get through this crap. This isn't gonna help, having me—implicated in any of this."[93]

- Then the agent explained that answering these questions might help Appellant get back to his family. The agent said: "All right, well, so, you would want to…anyone would want to clear themselves. You know, and we've got to decide, uh, one thing that we do, lookin' at you, talkin' to you, um, the things that we know, the things that you fill in, we try to determine the person sitting in that seat, what level monster they are. Are they a monster here that's touchin' kids, that's doin' all that, or is it down here and they're just lookin'

---

[90] ROA.176.
[91] ROA.178.
[92] ROA.183-184.
[93] ROA.192.

at shit? Um, you know, and that— that's one of the things that we need to do, and for us to feel comfortable…For us to feel comfortable to, you know, let you have access to your own kids, is— is we've gotta— we've gotta be comfortable allowing that."[94]

- Appellant continued to implicate himself and admitted to at least two instances of setting up cameras.[95]

- The detective returned to the theme of a common religious faith and said,[96] "[b]ut we also believe— you and I both being believers, right, that we're all fallen and inherently sinful, and that there are, you know, there is the opportunity of redemption and forgiveness and repentance— true repentance, um, and of course, it's not our job— judge — our— our job to judge, right? I'm not perfect, I've made terrible mistakes. I make mistakes every day. Stuff that, you know, I'm sure God's not happy with me about, but it's what we do with that and how we move on from that is what— what matters. It's not the— the judgment of society first, it's God's judgment first, um, in terms of what happens to us. Me having— go ahead, I'm sorry."[97]

- Appellant continued to implicate himself.[98]

---

[94] ROA.205-206.
[95] ROA.210.
[96] ROA.228.
[97] ROA.215-216.
[98] ROA.222-223, 229, 231.

- Appellant asked, "what punishment am I looking at?" The detective responded: "I can't tell you,' cause of a lot of this has to do—so, in the federal system, taking personal responsibility for your actions affects what happens to you. It does."[99]

- Appellant again asked for an attorney.[100]

The trial court held an evidentiary hearing.[101] During this hearing, the detective testified that he used/manipulated Appellant's faith, in part, "to pull the statement out of him."[102]

The magistrate issued an opinion and denied Appellant's motion in full.[103] In rejecting Appellant's due-process argument, the magistrate wrote:

- ". . .the Court finds the circumstances of Defendant's interview with Agent Donnet and Detective Adcock are not similar to the circumstance of the police interview in Adair. In this case, in contrast to Adair, the Interviewers did not make representations that would deprive Defendant of the ability to understand the nature of his constitutional rights and the consequences of continuing to speak with the Interviewers."[104] And,

---

[99] ROA.233.
[100] ROA.233, 241, 706.
[101] ROA.675-830.
[102] ROA.762.
[103] ROA.319-348.
[104] ROA.346.

- "Here—unlike *Adair*—the Interviewers did not represent to Defendant that he would be better served if he spoke with Interviewers than if he did not."[105]

The district court overruled Appellant's objections to the magistrate's recommendation and adopted the magistrate's ruling as the order of the court.[106]

## IV.    Application of Law to Fact

Due-process guarantees prohibit the use at trial of involuntary statements given to the police.[107] The government must prove voluntariness by a preponderance of the evidence.[108] This Court evaluates voluntariness on a case-by-case basis, considering the totality of the circumstances.[109] As this Court has explained, "a statement is involuntary ... if the tactics employed by law-enforcement officials constitute a Fifth Amendment due process violation and are 'so offensive to a civilized system of justice that they must be condemned.'"[110]

The district court found the government met its burden because:

- ". . .the Court finds the circumstances of Defendant's interview with Agent Donnet and Detective Adcock are not similar to the circumstance of the police interview in *Adair*. In this case, in contrast to *Adair*, the Interviewers did not

---

[105] ROA.347.
[106] ROA.464.
[107] *Collins*, 973 F.2d at 1205.
[108] *Raymer*, 876 F.2d at 386.
[109] *Rojas-Martinez*, 968 F.2d at 418.
[110] *Lim*, 897 F.3d at 692 (analyzing statement in context of two-step strategy for interrogation to circumvent *Miranda*).

35

make representations that would deprive Defendant of the ability to understand the nature of his constitutional rights and the consequences of continuing to speak with the Interviewers."[111] And,

- "Here—unlike *Adair*—the Interviewers did not represent to Defendant that he would be better served if he spoke with Interviewers than if he did not."[112]

Thus the district court's opinion first rests on the contention that the Interviewers "did not make representations that would deprive Defendant of the ability to understand the nature of his constitutional rights and the consequences of continuing to speak with the Interviewers."[113]

Yet, the government's own evidence demonstrated otherwise.

As the government's conduct concerned "representations that would deprive Defendant of the ability to understand the nature of his constitutional rights and the consequences of continuing to speak with the Interviewers,"[114] the facts are almost identical with those in *Adair*. In both instances, the government emphasized that the *Miranda* warning was "a formality."[115] Further, in both cases, the government did not secure a waiver.[116] Here, unlike *Adair*, the government tried to secure a *Miranda* waiver, but Appellant refused saying "I'm not gonna sign anything. I don't know

---

[111] ROA.346.
[112] ROA.347.
[113] ROA.346.
[114] ROA.346.
[115] ROA.147-148, 346.
[116] ROA.147-148, 346.

what's going on."[117] But then the government deemphasized the importance of the waiver and said, "I don't necessarily need you to [sign the waiver.]."[118] Thus contrary to the district court's argument, this is similar to *Adair*.

The district court also reasoned "[h]ere—unlike *Adair*—the Interviewers did not represent to Defendant that he would be better served if he spoke with Interviewers than if he did not."[119] This is the frailest of the district court's arguments. First the detective argued to Appellant that his spiritual position would be improved if he confessed to them. Specifically, the detective shamefully manipulated Appellant's faith to suggest forgiveness from God if Appellant confessed (or "unburdened" himself) to law enforcement.[120] The detective

---

[117] ROA.148.

[118] ROA.149.

[119] ROA.347.

[120] ROA.215-216, 228. Counsel could not locate any authority that suggested confession of sin to law enforcement constituted a substitute for seeking forgiveness from God. For example, the Book of Common Prayer used in Episcopal services calls for a group confession of sin, but invites a moment of silence to encourage individual confession to God before a communal prayer for forgiveness for the previously confessed sin. *See The Book of Common Prayer* 320 (2007) ("The Deacon or Celebrant then says: "Let us humbly confess our sins unto Almighty God." Silence may be kept. Minister and People. "Most merciful God, we confess that we have sinned against thee in thought, word, and deed, by what we have done, and by what we have left undone. We have not loved thee with our whole heart; we have not loved our neighbors as ourselves. We are truly sorry and we humbly repent. For the sake of thy Son Jesus Christ, have mercy on us and forgive us; that we may delight in thy will, and walk in thy ways, to the glory of thy Name. Amen.") The Book of Common Prayer does not, as far as counsel is aware, call for confession to law enforcement.

This Court and the Supreme Court have recognized the "priest-penitent privilege" as a privilege against confessing to law enforcement. The Supreme Court explained "The priest-penitent privilege recognizes the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return." *Trammel v. United States*, 445 U.S. 40, 51, 100 S. Ct. 906, 913, 63 L. Ed. 2d 186 (1980).

emphasized that he and Appellant were "believers" and that as a believer their duty was to confess.[121] The detective took advantage of Appellant's faith and argued to Appellant that he had a religious duty to confess. The exploitation of what the Supreme Court characterized, in *Trammel*,[122] as "the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return," is exactly the type of repugnant conduct that no governmental official can condone.

But the Interviewers went further in emphasizing that Appellant's position would be improved if Appellant spoke with them. They explained to Appellant that Pettigrew was already in custody and that "he's got a jump on you, blaming you."[123] Thus the insinuation was that the outcome of the case hinged on what the individual defendants said to the police as opposed to what the evidence demonstrated.[124] The Interviewers told Appellant, repeatedly, that Pettigrew was speaking with them and the plain insinuation was that if Appellant remained silent (and thus exercised his constitutional right) then Appellant's predicament would worsen because Pettigrew would blame Appellant and the government would believe Pettigrew.

---

[121] ROA.215-216, 228.
[122] *Trammel*, 445 U.S. at 51.
[123] ROA.175.
[124] ROA.175.

Additionally, the Interviewers also alleged that Appellant's position would be improved if he spoke with them because speaking with them might allow Appellant to reunite with his family.[125] Specifically, the detective explained that he and the agent had to be satisfied that it was safe for Appellant to be around his children before he could be around them and that the opportunity to demonstrate that he posed no risk to his children was during this interview and/or a polygraph.[126] Yet, bearing a federal-arrest warrant for production of child pornography, there was almost no chance Appellant would be released to be with his family. Instead this was simple manipulation.

Thus, contrary to the magistrate's conclusion, the government did not carry its burden to prove beyond a reasonable doubt that Appellant's statements were voluntary.[127] Accordingly the magistrate and the district court erred.

Having shown error, the government must establish beyond a reasonable doubt that a rational jury would have found Appellant guilty absent the error.[128]

## V.    Conclusion

Accordingly, Appellant has demonstrated that the government abused its position and for an hour and forty-one minutes coerced Appellant into confessing.

---

[125] ROA.205-206.
[126] ROA.205-206.
[127] *Raymer*, 876 F.2d at 386.
[128] *United States v. Muhammad*, 14 F.4th 352, 357 (5th Cir. 2021).

Therefore, the district court erred when it found otherwise. Appellant asks this Court to find Appellant's statements were coerced, vacate the district court's judgment and opinion, and remand this case for a new trial.

## Appellant's Second Issue

In his second issue, Appellant contends the district court erred when it granted the government's request to strike Appellant's expert witness under Rules 401, 403, and 702 of the Federal Rules of Evidence.

### I.    Standard of Review

This Court reviews a district court's evidentiary rulings for abuse of discretion, subject to harmless-error analysis.[129]

### II.    Evidentiary Rules: Rules 401, 403, and 702 of the rules of evidence

A. Rule 401

Rule 401 provides: "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."[130]

B. Rule 403

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[131]

---

[129] *United States v. Girod*, 646 F.3d 304, 318 (5th Cir. 2011) (quoting *United States v. Cantu*, 167 F.3d 198, 203 (5th Cir. 1999)); *United States v. Perry*, 35 F.4th 293, 325 (5th Cir. 2022).

[130] FED. R. EVID. 401.

[131] FED. R. EVID. 403.

C. Rule 702

Finally, Rule 702 provides: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."[132]

## III.   Facts

On June 30, 2022, Appellant gave notice of his intent to use Dr. Kristi Compton, Ph.D. as an expert.[133] This designation explained that Dr. Compton is a clinical psychologist.[134] Appellant's designation explained that Dr. Compton would testify:

- "that the Defendant's personality leads him to be compliant and avoidant of conflict, possibly to the point of being in denial about other's intentions."[135] And,

---

[132] FED. R. EVID. 702.
[133] ROA.315-317.
[134] ROA.316.
[135] ROA.316.

- "that based on the results of her examination, evaluation, testing, and assessment of the Defendant, it is her expert opinion that the Defendant….shows no signs of pedophilia."[136]

The government moved to "exclude proposed opinion testimony of Kristi Compton."[137] The government sought to exclude this evidence under Rules 403 and 702.[138] On the morning of trial, the district court excluded the testimony under Rules 401, 403, and 702.[139]

## IV. Application of Law to Fact

A. The trial court erred in finding the testimony irrelevant.

As the Court is aware, Rule 401 provides: "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."[140] Appellant explained that Dr. Compton would testify:

- "that the Defendant's personality leads him to be compliant and avoidant of conflict, possibly to the point of being in denial about other's intentions."[141] And,

---

[136] ROA.316.
[137] ROA.351, 874. The motion also raises Rule 401.
[138] ROA.351-361.
[139] ROA.465-468, 874.
[140] FED. R. EVID. 401.
[141] ROA.316.

43

- "that based on the results of her examination, evaluation, testing, and assessment of the Defendant, it is her expert opinion that the Defendant….shows no signs of pedophilia."[142]

The district court excluded the evidence explaining: "[w]hether Rider has the characteristics of a pedophile or a particularly compliant personality that may have motivated him to act is simply not relevant to any element of § 2251 that the government must prove."[143]

Appellant pleaded "not guilty" and thus the government had the burden to establish that Appellant committed the alleged acts. The government, during its first interview with Appellant, emphasized that they had videos of the Appellant setting up the cameras.[144] Appellant's response to this was to say that he was involved: 1) due to pressure from Pettigrew because Pettigrew possessed nude images of Appellant's wife;[145] 2) the videos were intended to record innocuous but entertaining candid moments for a video montage;[146] and, 3) he acted without thinking and could not explain why he consented to participating in the videotaping.[147]

At a minimum, Appellant's second explanation for this involvement in this scheme would have benefited from testimony that: 1) Appellant was not a pedophile

---

[142] ROA.316.
[143] ROA.466.
[144] ROA.171.
[145] ROA.178.
[146] ROA.179.
[147] ROA.231.

and had no sexual interest in children; and 2) that Appellant was frail and did as he was told without challenging it. Thus Dr. Compton's testimony would have been relevant to have a "tendency" to make the question of whether Appellant "employed, used, persuaded, induced, enticed, or coerced" a minor into taking a shower in front of a video camera more or less likely and was thus relevant.[148]

The jury charge also helps demonstrate relevance. The charge allowed the jurors to ask "whether the depiction is designed to elicit a sexual response in the viewer."[149] The charge explained that this was an example of the issues a juror could consider when deciding whether the videos included "a lascivious exhibition on the genitals."[150] A "lascivious exhibition of the genitals" is one way the charge defined "sexually explicit conduct."[151] "Sexually explicit conduct" was necessary for a finding that Appellant committed the offense.[152] Therefore, a juror would have acted within his or her discretion to ask whether Appellant had a sexual interest in children.

---

[148] FED. R. EVID. 401; 18 U.S.C. § 2251(a). Intent is at least an element that can be considered under § 2251. Here intent pertained to the question "whether the depiction is designed to elicit a sexual response in the viewer." ROA.504. If the image was intended to be of clothed children acting candidly, then an argument exists (whether accepted or not) that the image was not a violation of § 2251. *See also United States v. Steen*, 634 F.3d 822, 827-828 (5th Cir. 2011). In *Copeland*, this Court explained Congress has "imposed strict liability with respect to a victim's age" in 2251(a). *United States v. Copeland*, 820 F.3d 809, 814 (5th Cir. 2016). The Court went on to write "18 U.S.C. § 2251(a), sexual exploitation of children, prohibits using children in 'any sexually explicit conduct' for the purpose of production or transmission." *Id.* But even under this construction, the question of whether Appellant used the victims for "sexually explicit conduct" is a question that includes intent. *See* ROA.504.
[149] ROA.504.
[150] ROA.503.
[151] ROA.503-504.
[152] 18 U.S.C. § 2251(a); 18 U.S.C. § 2256(2)(A).

Expert testimony that Appellant had no sexual interest in children would have been strong and objective evidence that would have weighed in Appellant's favor. Thus, for this reason alone, the trial court erred when it found Dr. Compton's testimony irrelevant.

Accordingly, the district court erred when it found the evidence irrelevant and prohibited Dr. Compton from testifying.

### B. Rule 403

The district court also found the evidence inadmissible under Rule 403. Rule 403 provides: "The court may exclude relevant evidence if its probative value is <u>substantially</u> outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[153] The district court's 403 analysis reads: 1) "the only issue in this case is whether [Appellant] produced child pornography;" and 2) "Further, 'because of an expert's stature *qua* expert, jurors may assign more weight to expert testimony than it deserves.'"[154] The district court concluded: "Thus, not only is the probative value of Dr. Compton's testimony limited, but it also presents a risk that the jury may give the testimony undue consideration simply because it comes from an expert."[155] The district court erred.

---

[153] Fed. R. Evid. 403.
[154] ROA.466-467.
[155] ROA.467.

First the district court relied on its finding that Dr. Compton's testimony was not probative.[156] Appellant, however, has demonstrated that the testimony was probative. Specifically, Appellant argued that he believed the videos were intended to record innocuous but entertaining or candid moments for a video montage.[157] If this was true, then it went directly to whether Appellant "employed, used, persuaded, induced, enticed, or coerced" a minor into taking a shower in front of a video camera because the jury could consider questions like "whether the depiction is designed to elicit a sexual response in the viewer."[158] Accordingly, the district court erred when it found the evidence lacked probative value.

The district court also erred when it found the prejudicial value <u>substantially</u> outweighed the probative value. The district court made no specific findings for this case or about Dr. Compton and simply wrote: "[f]urther, 'because of an expert's stature *qua* expert, jurors may assign more weight to expert testimony than it deserves.'"[159] The district court reasoned from the general to the specific and found that because juries can give expert testimony more weight than the testimony deserves that in this case the jurors might too and that possibility created a "prejudicial value [that] outweighed the probative value." Yet the district court never

---

[156] <u>ROA. 466</u>.
[157] <u>ROA.179</u>.
[158] <u>FED. R. EVID. 401</u>; <u>18 U.S.C. § 2251(a)</u>; <u>ROA.504</u>.
[159] <u>ROA.466-467</u>.

explained why the prejudicial value would be so high other than the fact that sometimes some jurors give expert testimony more weight than it is due. But there was no evidence and no finding that in this case the jurors would do so.

The presence of error and the mere possibility of harm should have resulted in an easy balancing test. The evidence had probative value as it allowed Appellant to explain why he participated in this scheme and to have that reason supported by objective and scientific evidence from a clinical psychologist. The mere possibility that a jury could give an expert witness undue weight exists in nearly every case with an expert. There was no evidence in this case that the jury was likely to do so or even a suggestion that it might. Indeed, at the time the trial court wrote the order the trial court did not know who the jurors were as the trial court struck Dr. Compton on July 15, 2022 and held jury selection on July 18, 2022.[160] Because the trial court did not know who the potential jurors were, there was nothing to support the claim of undue prejudice other than simple speculation. Therefore, the trial court should have balanced the probative and prejudicial factors and found that it favored allowing Dr. Compton to testify. Yet the trial court found the prejudicial effects were greater and that the prejudicial value substantially outweighed the probative value.

---

[160] ROA.439 (order striking Dr. Compton on July 15), 874 (beginning of jury selection on July 18, 2022).

Thus the district court erred in finding the evidence more prejudicial than probative.

## C. Rule 702

Finally, the district court prohibited Dr. Compton from testifying under Rule 702.[161] This Court is aware that Rule 702 provides: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;"[162] The district court relied on a case from 1987 from the Tenth Circuit and wrote:

> The Court finds that Dr. Compton's testimony is excludable under Rule 702. *United States v. Esch* is instructive on this point. 832 F.2d 531 (10th Cir. 1987). In *Esch*, the defendant, who was charged with violating § 2251, argued that the district court erred in excluding the testimony of her expert witness, a clinical psychologist. *Id*. at 534. The expert intended to testify as to the defendant's "particular psychological characteristics," including the defendant's "values regarding sexuality" and "that the defendant had a 'dependent personality.'" *Id*. The Tenth Circuit affirmed the ruling of the district court, finding that the testimony "essentially addressed the issue of intent," which "was a matter of fact for the jury." *Id*. at 534–35. Thus, the testimony was properly excluded under Rule 702 because "[a]n expert may not substitute her judgment as to the defendant's state of mind by testifying that because of the defendant's personality, she would not have acted in a particular manner." *Id*. at 535. The same logic applies here. Dr.

---

[161] ROA.467-477.

[162] FED. R. EVID. 702.

Compton's testimony appears to focus solely on Rider's capacity and character to form the requisite intent. Because this is a subject matter that the jury is capable of evaluating without the assistance of an expert, the testimony is properly excludable under Rule 702.[163]

Counsel for Appellant need not address *Esch* and instead addresses the district court's reasoning. As Appellant has argued, Dr. Compton's testimony supported his argument that he believed the videos were intended to record innocuous but entertaining candid moments for a video montage.[164] There is no reason jurors should be able to identify Appellant's sexual preferences as people are adept at disguising their sexual interests (whatever those interests are).[165] But if Appellant had no sexual interest in children, then his argument that he believed he was setting up the video cameras to create a candid and innocuous video is increasingly plausible. Dr. Compton was the only witness who could have testified objectively to whether Appellant had a sexual interest in children. There was never a claim that Dr. Compton could not make such an evaluation and the trial court's decision to exclude her was error.

D. Conclusion on error

For these reasons, the district court erred in excluding Dr. Compton's testimony under Rule 401, 403, and 702.

---

[163] ROA.467-468.
[164] ROA.179.
[165] *See, e.g., Gibson v. Pollard*, No. 14-C-045, 2014 WL 11392978, at *1 (E.D. Wis. Apr. 29, 2014) ("courts may grant anonymity to a closeted homosexual").

E.  Harm

This Court has explained, "[a] nonconstitutional trial error is harmless unless it had substantial and injurious effect or influence in determining the jury's verdict."[166] In *Buck*, this Court wrote "[d]espite the fact that it was an error of law, and therefore an abuse of discretion, to admit the diagram, it was harmless, because the diagram accurately summarized testimony and other evidence that had been properly admitted and therefore was already before the jury."[167]

The first harm consideration is that the jury charge allowed the jurors to ask, "whether the depiction is designed to elicit a sexual response in the viewer."[168] Jurors could have read this instruction referring as a generic viewer or to Appellant. But the charge also told the jurors that they were not limited to the so-called *Dost* factors and could consider anything before them. Therefore, a juror would have acted within his or her discretion to ask whether Appellant had a sexual interest in children. Expert testimony that Appellant had no sexual interest in children would have been strong and objective evidence that would have weighed in Appellant's favor. Thus, for this reason alone, the error was harmful.

Here the video recordings showed Appellant as a person involved in the scheme and Pettigrew testified to Appellant being involved in the scheme.

---

[166] *United States v. Buck*, 324 F.3d 786, 790 (5th Cir. 2003).
[167] *Id*.
[168] ROA.504.

Appellant's only argument against this was that he intended to record the children while they were clothed in a candid and humorous moment. The testimony from Dr. Compton would have made that argument far more plausible. Presumably a person without a sexual interest in children would not furtively video record children bathing. Dr. Compton provided an objective and scientific basis for Appellant to advance his defensive argument. Dr. Compton would have testified "that based on the results of her examination, evaluation, testing, and assessment of the Defendant, it is her expert opinion that the Defendant….shows no signs of pedophilia."[169] Presumably, as a clinical psychologist, Dr. Compton was prepared by education and training to assess whether someone has a sexual interest in children and for that reason Dr. Compton's opinion should have been a persuasive tool for Appellant.

This case is unlike *Buck* because here the evidence that Appellant did not have a sexual interest in children did not come from an authoritative source like Dr. Compton. Thus, unlike *Buck*, the evidence was not simply duplicative of the evidence the jury had already heard, but was instead powerful new evidence the jury should have heard. Therefore the error was harmful.

## V.    **Conclusion**

Appellant has demonstrated that the trial court abused its discretion by prohibiting the testimony of Dr. Compton. Appellant has also demonstrated that the

---

[169] ROA.316.

error was harmful. Accordingly, Appellant asks this Court to vacate the trial court's

verdict and to remand for a new trial.

## **Appellant's Third Issue**

In his third issue, Appellant contends the evidence was insufficient to support the verdict on counts two and three. Appellant does not challenge the sufficiency of the evidence for count one.[170]

### I.    Standard of Review

This Court reviews a challenge to the sufficiency of the evidence de novo.[171] On de novo review, this Court will affirm a jury verdict "if a reasonable trier of fact could conclude from the evidence that the elements of the offense were established beyond a reasonable doubt, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences from the evidence to support the verdict."[172] "The Court does not consider whether the jury correctly determined innocence or guilt per se, but whether the jury made a rational decision."[173]

### II.    Law

The indictment charged Appellant with three counts.[174] All counts alleged a violation of 18 U.S.C. § 2251(a) and (e).[175]

---

[170] Appellant contrasts the evidence in counts two and three with the evidence in count one. This is intended to be done within the confines of a sufficiency argument and should not be interpreted as a concession.

[171] *See United States v. Brown*, 727 F.3d 329, 335 (5th Cir. 2013).

[172] *United States v. Reed*, 908 F.3d 102, 123 (5th Cir. 2018) (internal quotation marks and citation omitted).

[173] *United States v. Nolasco-Rosas*, 286 F.3d 762, 765 (5th Cir. 2002).

[174] ROA.98-101.

[175] ROA.98-101.

The charged section reads:

(a) Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, <u>with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct</u>, shall be punished as provided under subsection (e), if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed.[176]

Section 2256(2)(A) defines "sexually explicit conduct" as:

(2)(A) Except as provided in subparagraph (B), "sexually explicit conduct" means actual or simulated—

> (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;

> (ii) bestiality;

> (iii) masturbation;

> (iv) sadistic or masochistic abuse; or

---

[176] <u>18 U.S.C. § 2251(a)</u>. Subsection (e) is the punishment section and is not challenged on sufficiency grounds.

(v) lascivious exhibition of the anus, genitals, or pubic area of any person;[177]

This Court has said "[w]e have previously adopted the ordinary meaning of the phrase 'lascivious exhibition,' which we defined as 'a depiction which displays or brings forth to view in order to attract notice to the genitals or pubic area of children, in order to excite lustfulness or sexual stimulation in the viewer.'"[178]

"To sustain a conviction for attempt, the evidence must show the defendant (1) acted with the culpability required to commit the underlying substantive offense, and (2) took a substantial step toward its commission."[179]

In *Steen* this Court considered a surreptitious recording of a nude minor in a tanning bed.[180] The government prosecuted Steen for production of child pornography.[181] The case turned on the issue of whether the video included a "lascivious exhibition" of the minor's "genitals or pubic area."[182] The Court considered the *Dost* factors and wrote:

> In considering the *Dost* factors and the statutory text, we find that the evidence was insufficient to find a lascivious exhibition of the genitals. First, the focal point of the visual depiction is not on C.B.'s genitalia or pubic area. Her pubic region is only visible for about 1.5 seconds. Moreover, the film did not accent the pubic area—to the contrary, the brief seconds the pubic region is visible, it is on the far side of the

---

[177] 18 U.S.C. § 2256(2)(A).
[178] *Steen*, 634 F.3d at 828.
[179] *United States v. Olvera*, 687 F.3d 645, 647 (5th Cir.2012).
[180] *Id*. at 824. The facts are more complicated but eventually resulted in a discovery that one of the victims was a minor. *Id*.
[181] *Id*.
[182] *Id*. at 826.

image's frame. The first factor lacks factual support here. It does not point to a finding of lasciviousness.

The second and third factors consider whether the setting or pose of the depiction is sexually suggestive or unnatural. Traditional settings that meet this standard are beds or bedrooms. A tanning salon is not a sexually suggestive setting, nor are C.B.'s movements unnatural for someone who is tanning. Because she did not know she was being filmed, she is, of course, acting naturally. Under certain circumstances, lying on one's back may be sexually suggestive, but that is not the case when the non-sexual activity being displayed requires one to lie on the back. The fifth factor, suggesting sexual coyness, is irrelevant in this case because C.B. did not know she was being filmed. She neither acts coy nor willing to engage in sexual activity.

The fourth *Dost* factor is nudity, which Steen's video satisfies since C.B. was fully nude for her tan. However, the Supreme Court has held that "nudity, without more is protected expression." Surreptitiously filming a nude tanner, on its own, does not meet the standard for producing child pornography.

The sixth factor is the most difficult to apply—whether the visual depiction is intended or designed to elicit a sexual response in the viewer. Here, the primary evidence of intention to elicit a sexual response is that Steen surreptitiously filmed a nude 16–year–old. However, as a Missouri district court held in a similar case:

> These videos could not be considered to have been intended to elicit a sexual response in the viewer any more than mere nudity would, which several courts have concluded is not of a sexual character. We do have some limited context ... that [the defendant] set up a camera ... but that context indicates nothing more than an attempt to capture mere nudity and is very different than a person ... telling a minor to undress, lay on a bed, and open his legs for a nude photo.

Even if one assumes Steen was stirred by his voyeuristic pursuits, there is insufficient evidence to conclude that the image of C.B.'s genitals was designed to elicit a sexual response or whether, perhaps, merely being a voyeur excited Steen. When a photographer selects and

positions his subjects, it is quite a different matter from the peeking of a voyeur upon an unaware subject pursuing activities unrelated to sex.[183]

Judge Higginbotham concurred to "write separately to note [his] misgivings about excessive reliance on the judicially created *Dost* factors that continue to pull courts away from the statutory language of 18 U.S.C. § 2251."[184]

### III.    Facts

Here Appellant challenges the sufficiency of the evidence for the second and third counts.

Count two alleged the creation of child pornography for Victim 1.[185] Count three alleged the creation of child pornography for Victim 2.[186] Victim 1 is "RAM" and Victim 2 is "KK."[187] The jury charge did not instruct the jurors which victim corresponded with which count, but the jurors sent a note to the district court and the district court explained that count two related only to "RAM" count three related only to "KK."[188]

### IV.    Application of Law to the Facts

The analysis in this case is similar to that in *Steen* and begins with the *Dost* factors.

---

[183] *Id*. at 827-828.
[184] *Id*. at 8282.
[185] ROA.99-100.
[186] ROA.100-101.
[187] ROA.2194.
[188] ROA.2194.

Here, Victim 1's pubic area was either never visible or was only visible fleetingly. The video cannot be said to have been focused on Victim 1's genitals or pubic area. Instead it was a video taken across a bathroom toward a commode that was obscured by a half wall. Had the video even constituted an attempt to focus on "RAM's" pubic area, the camera, presumably, would have been placed much closer to the commode and in a manner similar to the cameras in the conspiracy count.

Victim 2's pubic area was visible longer than in *Steen*. But, as the attorney for the government explained, the video showed Victim 2 "while she was . . . coming in, undressing, entering, exiting the shower, and toweling off."[189] Thus the video did not focus on Victim 2's pubic area or her genitals but instead showed her from body generally. The plain meaning of "pubic area" must refer to the anterior/ventral (or front) side of the human body as opposed to the posterior and to the area at or around the female-sexual organ. Here, the video images alternate between the anterior and the posterior sides of Victim 2's body and the static image does not focus any more on Victim 2's genitals or her pubic region than it does her hand. Had the image been even an attempt to focus on Victim 2's genitals, then the camera would have been placed as the cameras in the conspiracy count were placed.

This factor should weigh in favor of Appellant.

---

[189] ROA.1077.

The second and third *Dost* factors inquire into the body positions. Nothing in the videos suggests either subject was posed seductively. Instead, Victim 1 is simply using a toilet across a bathroom and behind a low wall. And, as the government explained, Victim 2 was "filmed coming in, undressing, entering, exiting the shower, and toweling off."[190] As in *Steen*, these subjects were unaware of the video and thus acted naturally. There are instances where a shower (and *arguably* a toilet) can be suggestive, but in this case, as in *Steen*, the victims were unaware of the fact they were being recorded and thus Appellant did not pose them to appear coy or to suggest an invitation for sexual contact.

These factors weigh in Appellant's favor.

In *Steen*, this Court found that nudity alone was not sufficient to demonstrate a criminal act. The same should be true here. While the subjects of the videos are naked or largely naked (in the case of Victim 2 as she gets in and out of the shower and towels off), the nudity is not suggestive of sexual activity. As in *Steen*, this should weigh in Appellant's favor.

As in *Steen*, there is no information to allow a conclusion that Appellant sought the images for a sexual response. In *Steen*, the Court explained, "perhaps, merely being a voyeur excited Steen." The same is true here. Unlike Pettigrew, Appellant had no history of sexual contact with children and had she been allowed

---

[190] ROA.1077.

to testify, then Dr. Compton would have testified Appellant had no interest in children.

"To sustain a conviction for attempt, the evidence must show the defendant (1) acted with the culpability required to commit the underlying substantive offense, and (2) took a substantial step toward its commission."[191] In counts two and three the evidence is insufficient to show a "substantial step toward [] commission" of the charged offense. Specifically, in counts two and three the cameras were never placed to create the "lascivious exhibition of the anus, genitals, or pubic area" of the subjects.[192] To attempt to create the required lascivious exhibition, the cameras had to be placed differently. A camera that was placed facing a person who sat on the commode would qualify as a substantial step, as would a camera set up to take a "zoomed" in image of someone getting into or out of the shower (even if unsuccessful) would qualify. But, here, the cameras go only to recording images of the whole body with no effort and no "substantial effort" to record the "lascivious exhibition of the anus, genitals, or pubic area" of the subjects.[193]

Consider this Court's finding of "attempt" in *McGee*.[194] There, this Court wrote:

---

[191] *Olvera*, 687 F.3d at 647.
[192] 18 U.S.C. § 2256(2)(A).
[193] *Id.*
[194] *United States v. McGee*, 821 F.3d 644, 648 (5th Cir. 2016).

McGee repeatedly sought a picture of Josh's genitals, even after Josh sent a less explicit picture of himself and exhibited reluctance to put a picture of his genitals "out there." McGee asked if Josh had a webcam or Skype. These facts, combined with Josh's reluctance to put an explicit picture "out there," McGee's persistence after Josh said he'd sent his best picture, and McGee's attempt to entice Josh to show him his genitals in exchange for meeting the next day, all support a reasonable inference that McGee knew Josh would have to take a new picture to comply. Accordingly, the evidence reasonably supports that McGee purposefully sought to have Josh take and send a newly-created picture of his genitals via email, which would satisfy the statute.[195]

Thus the conduct in *McGee* showed a failed effort to secure an image of the victim's genitals.[196] Unquestionably this would constitute a lascivious exhibition of the anus, genitals, or pubic area of any person.[197] The record does not allow for a conclusion that the images in counts two and three were of the same category. Instead, the images were nearly "full body" images that were never "zoomed" in to allow for them to be an attempt at a lascivious exhibition of the anus, genitals, or pubic area of any person.[198]

Thus, when the evidence is weighed, the evidence does not allow for the conclusion that the images of Victim 1 or of Victim 2 included a lascivious exhibition of the anus, genitals, or pubic area of any person.[199] The evidence is even insufficient to demonstrate an attempt. If the cameras were an attempt to secure a

---

[195] *Id.*

[196] *Id.*

[197] 18 U.S.C. § 2256(2)(A).

[198] *Id.*

[199] *Id.*

62

lascivious display, then the cameras would have been set up as they were in count one. Here, however, the cameras were set up so that they would be unlikely to focus on the female-sexual organ or pubic area. Therefore the evidence is insufficient to support the verdict for counts two or three.

## V.    Conclusion

Accordingly, Appellant asks this Court to find the evidence is insufficient to support the verdict for counts two and three.

### Appellant's Fourth Issue

In his fourth issue, Appellant contends the trial court erroneously allowed a constructive amendment.

This Court reviews "constructive amendment claims de novo."[200] "If [the Court] conclude[s] that there has been a constructive amendment, [the Court] must reverse the defendant's conviction."[201] "A constructive amendment occurs 'when the jury is permitted to convict the defendant upon a factual basis that effectively modifies an essential element of the offense charged' in the indictment."[202]

The seminal case on this issue is *Stirone*. This Court has interpreted *Stirone* many times.[203] Under this Court's precedent, when the indictment alleges a particular set of facts as forming the basis for the defendant's violation of a statute, but the trial court allows evidence of other facts not alleged in the indictment to form the basis of the jury's guilty verdict, this court finds a constructive amendment.[204] In *Chambers*, for example, the indictment alleged that the defendant possessed "rounds" distributed by a particular manufacturer.[205] At trial, however, the government presented evidence of the defendant's possessing ammunition components, rather than completed rounds. Notably, the statute cited in the

---

[200] *United States v. Lockhart*, 844 F.3d 501, 514 (5th Cir. 2016)
[201] *Id.*
[202] *Id.*
[203] *Id.*
[204] *Id.* (citing examples).
[205] *United States v. Chambers*, 408 F.3d 237, 238-239 (5th Cir. 2014).

indictment allowed for conviction under either theory. This Court concluded that the district court constructively amended the indictment.[206] Because the Government established an essential element of the offense on the basis of facts wholly different from those particularized in the indictment, this Court vacated the jury's guilty verdict.[207]

This Court reached a similar conclusion in *Hoover*.[208] In *Hoover*, the indictment alleged one false statement but another was proven during trial.[209]

Here, the indictment alleged in counts two and three that the offense occurred with "a concealed recording device and the internet."[210] The jury charge, however, for count two allowed for a conviction if Appellant used any "materials that had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer."[211] And the charge for count three was the same allowing for conviction if the "the visual depiction was produced using materials that had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer."[212]

---

[206] *Id.* at 242.
[207] *Id*. at 247.
[208] *United States v. Hoover*, 467 F.3d 496, 502 (5th Cir. 2006)
[209] *Id.*
[210] ROA.100-101.
[211] ROA.497.
[212] ROA.500.

Here the charge included a constructive amendment because it allowed for a conviction if the image was created using any material that had affected interstate or foreign commerce.[213] Permitting any item that affected interstate or foreign commerce is plainly broader than "a concealed recording device and the internet."[214] Thus the district court allowed the jury to convict Appellant upon a factual basis that effectively modified an essential element of the offense charged in the indictment.[215] This is a constructive amendment and reversal is required.[216]

The error in *Lockhart* was objected to.[217] Here the error was not objected to.[218] Because Appellant did not object to the jury instruction in the district court, the standard of review requires meeting plain error.[219] Review under plain error requires reversal only if "(1) there is an error, (2) that is clear or obvious, and (3) that affects [the defendant's] substantial rights."[220] If these factors are met, then "the decision to correct the forfeited error is within the sound discretion of the court, and the court will not exercise that discretion unless the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."[221]

---

[213] ROA.497, 500.
[214] ROA.100-101.
[215] *Lockhart*, 844 F.3d at 514.
[216] *Id*.
[217] *Id*. at 515 n.3.
[218] ROA.429-436, 2100-2101.
[219] *Id*.
[220] *Id*.
[221] *United States v. Scher*, 601 F.3d 408, 411 (5th Cir. 2010).

Here Appellant can meet this challenging standard. First error exists because the charge allowed the jury to convict Appellant for any recording item that affected interstate or foreign commerce when the indictment alleged "a concealed recording device and the internet."[222] Therefore Appellant meets the first prong. Appellant meets the second prong because the error is clear and obvious. The error requires only a comparison of what was in the jury charge with what was in the indictment. Generally, the only way to show that an error affected a defendant's substantial rights is to demonstrate that the error affected the outcome of the district court proceedings.[223] In this case, there was no evidence Appellant used the internet to make or transmit the video. The evidence did not explain how the images were stored or if they were transmitted to a device that was remote from the camera. Thus without the constructive amendment, the government could not have secured the conviction. Finally, Appellant ask this Court to exercise its discretion because a conviction based on acts not alleged goes to the core of the judicial system and fairness. Accordingly, Appellant argues that he met the required standard for plain error and he urges this Court to vacate the judgments in counts two and three.

---

[222] ROA.497, 500.
[223] *Puckett v. United States*, 556 U.S. 129, 135, 129 S. Ct. 1423, 1429, 173 L. Ed. 2d 266 (2009).

## **Appellant's Fifth Issue**

In his fifth issue, Appellant contends the district court's sentence is substantively unreasonable.

This Court reviews the substantive reasonableness of a sentence under a deferential abuse of discretion standard.[224] A non-Guidelines sentence will be found substantively unreasonable when it "(1) does not account for a factor that should have received significant weight, (2) gives significant weight to an irrelevant or improper factor, or (3) represents a clear error of judgment in balancing the sentencing factors."[225]

A presentence report generally bears sufficient indicia of reliability to be considered by the sentencing judge in making factual determinations.[226] In such a case, the defendant has the burden of presenting rebuttal evidence to show that the information is "materially untrue, inaccurate or unreliable."[227] "It is well-established that prior criminal conduct not resulting in a conviction may be considered by the sentencing judge" in a determination whether an upward variance under 18 U.S.C. § 3553(a) is warranted.[228]

---

[224] *See Gall v. United States*, 552 U.S. 38, 51, 128 S. Ct. 586, 169 L. Ed. 2d 445 (2007).
[225] *United States v. Smith*, 440 F.3d 704, 708 (5th Cir. 2006).
[226] *United States v. Harris*, 702 F.3d 226, 230 (5th Cir. 2012).
[227] *Id*. (internal quotation marks and citation omitted).
[228] *United States v. Lopez-Velasquez*, 526 F.3d 804, 807 (5th Cir. 2008).

Here Appellant's PSR established that Pettigrew received a sentence of 360 months and supervised release of fifteen years.[229] The PSR also established a Guidelines range of 324 months to 360 months for each count.[230] The PSR recommended a sentence of 360 months for each count and for each sentence to run concurrent with the others.[231] The Guidelines provide "If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects, sentences on all counts shall run concurrently, except to the extent otherwise required by law."[232]

Counsel for Appellant argued that an upward variance was inappropriate in this case because:

- only 1.2 percent of all defendants sentenced under U.S.S.G. § 2G2.1 received an upward variance and thus it is reserved for the most awful offenders;[233]

---

[229] ROA.4850.
[230] ROA.4864, 4867, 4916.
[231] ROA.4867, 4916.
[232] U.S.S.G. § 5G1.2.
[233] ROA.2269.

- that parents, those who abuse infants and toddlers, and those who abuse incapacitated victims receive shorter sentences than the government sought (and the one the trial court imposed);[234]

- around sixty percent of production cases involve abuse of trust;[235]

- most offenders distribute their images internationally and are part of a community of offenders; Appellant did not distribute beyond Pettigrew and did not belong to a community of offenders;[236]

- the district court had imposed stacked sentences much lower than the amount requested by the government and ultimately imposed by the district court;[237]

- Appellant compared favorably to Pettigrew who received the maximum sentence of 360 months;[238] and,

- According to Appellant's counsel, David Pettigrew was a lifelong, dangerous pedophile. In his four-and-a-half-hour pre-polygraph interview, he admitted to surreptitiously photographing children in public, Walmart, schools, other places, misrepresenting his age to engage in sexual conversations, utilizing the dark web, admitted to getting an erection while changing the diaper of a friend's 1-year-old baby, later came back and then admitted that his penis was

---

[234] ROA.2270, 2271.
[235] ROA.2270.
[236] ROA.2273.
[237] ROA.2280-2283.
[238] ROA.2284.

out while changing the diaper, recorded his daughter's friend who was 11 and, worst of all, while a substitute teacher in a special education class in elementary school, he sexually assaulted a 7-year-old nonverbal autistic student while changing the child's diaper. Of course, as you know, he also had more than 70,000 images of child pornography and other exploitive materials.[239]

The district court listened to Appellant's argument and decided Appellant's case was "uniquely disturbing."[240] The district court also explained that had he had the opportunity to sentence Pettigrew to a longer sentence that he would have done so.[241] Then the district court imposed the sentence of 720 months on Appellant.[242]

The district court erred because its non-Guidelines sentence failed to account for Pettigrew's control of this production scheme. Pettigrew's long-sexual interest in children differed markedly from Appellant's history. Further, Appellant, while an important person at the church, had less responsibility than Pettigrew. Pettigrew's sentence should have been a benchmark for Appellant's and there is no basis for Appellant to have a sentence double that of Pettigrew. Accordingly, the district

---

[239] ROA.2284.
[240] ROA.2304.
[241] ROA.2309.
[242] ROA.2309.

court's sentence was substantively unreasonable, and Appellant asks this Court to remand this case for a new sentencing.

## CONCLUSION AND PRAYER

Appellant asks this Court to:

- find Appellant's confession involuntary, to vacate the district court's judgment, and to remand for a new trial;

- find the district court erred in striking Dr. Compton, to vacate the district court's judgment, and to remand for a new trial;

- find the evidence was insufficient to support the conviction on counts two and three and to vacate the judgment and render a judgment of acquittal;

- find a constructive amendment on counts two and three, to find the constructive amendment harmful, to vacate the district court's judgment, and to remand for a new trial;

- find the sentence substantively unreasonable, to vacate the district court's judgment, and to remand for a new sentencing hearing; and,

- impose any other relief to which Appellant might be justly entitled.

**Respectfully Submitted,**

**SCOTT H. PALMER, P.C.**

*/s/Niles Illich*
NILES S. ILLICH
State Bar No. 24069969

15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone: 214.987.4100
Facsimile: 972.204.5452
niles@scottpalmerlaw.com

/s/ *Howard Allen Sohn*
HOWARD ALLEN SOHN

1500 Gateway Blvd., Suite 220
Boynton Beach, Florida 33426

**Attorneys for Appellant.**

CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2023, that an exact copy of Defendant-Appellant's Brief was served via ECF to counsel for the Plaintiff-Appellee. I further certify that: (1) all privacy redactions have been made pursuant to 5th Cir. Rule 25.2.13; and (2) the electronic submission is an exact copy of the paper documents pursuant to 5th Cir. Rule 25.2.1.

*/s/Niles Illich*
NILES ILLICH
SCOTT H. PALMER, P.C.

<u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation in Rule 32(a)(7)(B) because:

- This brief contains 12,883 words (as counted by the word count feature in Microsoft Word) with no exclusions under Rule 32(f);

This brief also complies with the typeface requirements of Rule 32(a)(5) and the type requirements of Rule 32(a)(6) because:

- This brief has been prepared in Times New Roman font, a proportionally-spaced typeface, using Microsoft Word 2010 with 14-point font for the text and 12-point font for the footnotes.

<u>/s/Niles Illich</u>
NILES ILLICH
SCOTT H. PALMER, P.C.